**Charles and Dianne BETSEY, Carroll M. Adams, Richard and Jean Allen, William L. Allen, William F. Armstrong, Gerald and Kathryn Blunt, Malcolm Bondy, Richard Chmielewski, Nzundu Dissasi, Annette Drew, James and Eunice Eubanks, Theodore and Marlene Harvey, Nigel and Sara Haynes, B.J. Hudson, Doris Johnson, Thelma Johnson, Joyce Knight, D. Leslie McDonald, Wade McKinney, III, T.A. McWilliams, Jacques and Eleanor Opal, Carl and Linda Patterson, Gloria S. Proctor, Charles and Charlynn Pyne, Sherril Ross, Lois Seigel, Rufus and Sarah Settles, Kalyandrug Sivaram, Patricial A. Sullivan, James and Tanya Winfrey, and Metropolitan Washington Planning and Housing Association, Inc., Appellants,**

v.

**TURTLE CREEK ASSOCIATES, Krupp Associates, Douglas Krupp, George Krupp and Gerald S. Bartfield, Appellees.**

No. 82–1051.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1983.

Decided June 18, 1984.

Kerry Alan Scanlon, Washington Lawyers' Committee for Civil Rights Under Law, Washington, D.C. (William H. Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D.C., on brief), for appellants.

Robert B. Barnhouse, Baltimore, Md. (Deborah T. Garren, Piper & Marbury, Baltimore, Md., on brief), for appellees.

Teresa Demchak, James Morales, National Center for Youth Law, San Francisco, Cal., Carol R. Golubock, Children's Defense Fund, Bruce S. Gelber, Stacy Canan, Washington, D.C., National Committee Against Discrimination in Housing for *amici curiae.*

Before WINTER, Chief Judge, and PHILLIPS * and ERVIN, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Turtle Creek Associates, et al., the partnerships and partners who own and manage a three-building, high-rise apartment complex in Silver Spring, Maryland, known as The Point, issued eviction notices to many of the tenants of Building Three, allegedly to institute an all-adult rental policy. Plaintiffs, tenants of Building Three, most of whom are black and most of whom have children residing with them, and a non-profit corporation which has as its purpose elimination of discrimination in housing, sued the owners and managers for alleged violations of the Fair Housing Act of 1968, 42 U.S.C. §§ 3604(a) and (b). Plaintiffs' theory was that defendants acted with a racially discriminatory intent in seeking to evict them and that the evictions would have a disparate racial impact, both in violation of the Act. They sought injunctive relief, damages, and attorneys' fees.

After trial, the district court ruled that plaintiffs had proved a *prima facie* case of discriminatory intent in the all-adult conversion but that defendants had rebutted that evidence by proof that they were motivated by economic considerations and not race. The district court also ruled that plaintiffs had not proved a *prima facie* case of disparate racial impact. It therefore denied all relief and entered judgment for defendants on all claims.

Recognizing that the district court's ruling that defendants had successfully rebutted plaintiffs' proof of discriminatory intent depended largely on credibility determinations which were unassailable under the not clearly erroneous test, plaintiffs appeal only the ruling that they failed to prove a *prima facie* case of disparate racial impact. We agree with plaintiffs that this ruling cannot stand. We reverse the judgment and remand the case for further proceedings.

I.

The Point consists of three high-rise buildings constructed in the 1960's. Prior to September of 1979, the buildings, though they shared common facilities, had different owners. In late 1979, Turtle Creek acquired all three buildings and began a systematic effort to upgrade the properties. At the time Turtle Creek acquired The Point, Building Three was generally considered to be more desirable than its counterparts.[1]

Shortly after their acquisition of the complex, Turtle Creek instituted a series of new policies including: substantial rent increases, eviction notices based on alleged incidents of vandalism, and a change in the security staff. In May of 1980, eviction notices were sent to all families with children residing in Building Three. Tenants were required to move by August 1, 1980 or earlier if their leases had an earlier expiration date. Tenants who agreed to move in sixty days were given the right to move into comparable apartments in one of the other buildings, subject, however, to availability. Turtle Creek attempts to justify these evictions by contending that an "all-adult" conversion was necessary to reduce the vacancy rates in the complex.

In July of 1980, this action was instituted. Plaintiffs alleged a pattern of harass-

* While Judge Phillips sat as a member of the panel when argument was heard, he found it necessary to disqualify himself from further participation in the case before the case was decided.

1. Building Three had been extensively repaired and refurbished after it was acquired by Turtle Creek. One of defendants' employees described Building One as "on the whole quite disastrous," and Building Two as in "very poor" condition with ripped, soiled carpet and a foul odor.

ment against the black tenants at The Point, and they asserted a "deliberate and systematic effort to alter the racial character" of the property. The "all-adult" conversion policy resulting in eviction notices to families with children in Building Three was described as one part of a broad systematic effort to alter the racial composition of the complex. The complaint sought damages and declaratory and injunctive relief including an order requiring the defendants to desist from enforcing the eviction notices.

When plaintiffs pressed their prayer for a preliminary injunction seeking to restrain the evictions of families with children from Building Three, the district court, pursuant to Fed.R.Civ.P. 65(a)(2), consolidated the hearing thereon with trial on the merits. In April of 1981, the district court filed an opinion holding that the all-adult conversion of Building Three did not violate the Fair Housing Act. The district court correctly ruled that plaintiffs may establish a *prima facie* case of racial discrimination under the Fair Housing Act in two ways: by showing either that the act or practice complained of was racially motivated, or that it has a racially discriminatory impact. Though the district court found from the evidence that plaintiffs had established a *prima facie* case of discriminatory intent, it also found that Turtle Creek effectively refuted the claim by articulating a "valid non-discriminatory reason for the conversion." The court identified various "economic considerations" as valid non-discriminatory reasons. *Betsey v. Turtle Creek Assoc.*, No. R–80–1907, slip op. at 14–15 (D.Md. April 23, 1981).

Initially, the district court expressed the view that it was "unnecessary" under these circumstances to consider whether the tenants had proved a *prima facie* case of discriminatory impact. Nevertheless, it said that it "does not think plaintiffs could have done so." The district court reasoned that while "the immediate effect of the conversion will have a disproportionate impact on the black tenants", there was no evidence it would have "a continuing dis-

proportionate impact on blacks" or that it would "perpetuate or tend to cause segregated housing patterns at The Point." *Id.* at 11–12.

After the district court's opinion was filed, plaintiffs moved for reconsideration of the discriminatory impact issue. Plaintiffs argued that it was essential for the district court to make a finding as to whether a *prima facie* case of discriminatory impact had been shown and, if a *prima facie* case had been proved, whether defendants had proven a "compelling business justification" for the evictions. The district court, describing as "gratuitous" its original comment that it was "unnecessary" to determine whether a case of discriminatory impact had been adduced, found that no such case had been proved for the reasons stated in its earlier opinion. *Betsey v. Turtle Creek Assoc.*, No. R–80–1907, slip op. at 2, (D.Md. November 27, 1981).

## II.

We agree with the district court that a landlord's housing practice may be found unlawful under Title VIII either because it was motivated by a racially discriminatory purpose or because it is shown to have a disproportionate adverse impact on minorities. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1065 (4 Cir.1972). In this case, there were issues of both discriminatory intent and impact. As we have indicated, the district court's judgment with respect to discriminatory intent is not before us. Rather, the central issue on appeal is the district court's treatment of the discriminatory impact issue. This claim was dismissed with the following explanation:

The statistics in this case do show that the immediate effect of the conversion will have a disproportionate impact on the black tenants. However, there is no evidence that the conversion will have a *continuing* disproportionate impact on blacks. In fact, the percentage of blacks at The Point continues to exceed by a substantial margin both the percentage of black renters in the election district in

which The Point is located as well as in Montgomery County as a whole. Absent statistics which indicate that the conversion of Building Three would perpetuate or tend to cause segregated housing patterns at The Point, the court would be reluctant to find that plaintiffs had made a *prima facie* case of discriminatory impact. There is no evidence that the conversion of Building Three will have a greater impact on blacks in the local community nor is there evidence that the conversion will perpetuate segregation at The Point.

The district court's rejection of clear proof of discriminatory impact thus rests on three factors: the absence of a continuing disproportionate impact, the high percentage of blacks in the entire complex, and the insignificant impact of the policy on blacks in the local community. We think that each of these factors is irrelevant to a *prima facie* showing of racially discriminatory impact.

■ In order to prevail in a discriminatory impact case under Title VIII, plaintiffs, members of a discrete minority, are required to prove only that a given policy had a discriminatory impact on them as *individuals*. The plain language of the statute makes it unlawful "[t]o discriminate against *any person*." *See* 42 U.S.C. § 3604(b) (emphasis supplied). Title VII cases construing almost identical language have resolved this question beyond serious dispute. The Supreme Court has recently reaffirmed its position on this issue in *Connecticut v. Teal*, 457 U.S. 440, 102 S.Ct.

2525, 73 L.Ed.2d 130 (1982). There, it acknowledged that "[t]he principal focus of the statute [Title VII] is the protection of the individual employee, rather than the protection of the minority group as a whole." *Id.* at 453, 102 S.Ct. at 2534. We and other courts of appeals have recognized the parallel objectives of Title VII and Title VIII. *Smith v. Town of Clarkton, supra* at 1065; *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283 (7 Cir.1977), *cert. denied* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) (Arlington Heights II)[2] Accordingly, we conclude that plaintiffs are not required to show a discriminatory impact on anyone but the existing minority residents of Building Three. This simple verity renders consideration of the rest of the "local community", the rest of The Point, or even prospective applicants for space in Building Three irrelevant.

■ The correct inquiry is whether the policy in question had a disproportionate impact on the minorities in the total group to which the policy was applied.[3] In this case, the all-adult conversion policy was applied to the residents in Building Three. "Bottom line" considerations of the number and percentage of minorities in the rest of the complex or the community are "of little comfort" to those minority families evicted from Building Three. *Connecticut v. Teal, supra*, 457 U.S. at 454–455, 102 S.Ct. at 2535.

Defendants argue that plaintiffs have in some way arbitrarily designated the ten-

**2.** In *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (*Arlington Heights I*), the Supreme Court dealt only with the issue of whether certain alleged exclusionary zoning practices violated the fourteenth amendment. On remand, the Seventh Circuit considered the extent to which plaintiffs' allegations showed a violation of the Fair Housing Act.

**3.** By stressing the emphasis given in Title VII and Title VIII to the protection of individuals, we do not mean to suggest that this is the *only* way in which a discriminatory effect may be proved. Rather, we have endorsed the view espoused by the Seventh Circuit in *Arlington II, supra*. *See Town of Clarkton, supra*. In *Arling-*

*ton II*, the court noted that there are two kinds of racially discriminatory effects that a facially neutral decision about housing can produce. The first, as in this instance, occurs when a decision has a greater adverse impact on one race than another. The second concerns the effect of a decision on the entire community involved. For example, if a policy perpetuates segregation and thereby prevents interracial association, it will be considered invidious under the Fair Housing Act notwithstanding the fact that it may have no immediate impact. 558 F.2d at 1290. The error of the district court in this case was concentrating on the second type of discriminatory impact without considering the first.

ants of Building Three as the relevant group on which to assess the impact of the conversion policy. We disagree. The conversion policy affects only the occupants of Building Three. Thus, we see no merit in the argument that the effects of the conversion should be judged with reference to The Point as a whole.

### III.

From this record we think that there is little question that the all-adult conversion policy for Building Three had a substantially greater adverse impact on minority tenants. At the time when Turtle Creek began issuing eviction notices under the conversion policy, 62.9 percent of the tenants with children in the building were black and an additional 5.4 percent were other non-whites or Hispanic. In total, 54.3 percent of the non-white tenants in the building received termination notices as opposed to only 14.1 percent of the white tenants.

When the statistics are converted to reflect the total number of individuals affected, the results are even more striking. Of the total number of men, women and children living in Building Three, 74.9 percent of the non-whites were given eviction notices while only 26.4 percent of the whites received such notices. Under these circumstances, we believe a disparate impact is self-evident.[4]

■ The findings of the district court are not to the contrary. Indeed, the district judge acknowledged that "the immedi-

ate effect of the conversion will have a disproportionate impact on the black tenants." The district court erroneously concluded, however, that this alone was insufficient to establish a *prima facie* case of discriminatory impact. Because the law clearly provides that such an immediate and substantial impact is sufficient, we reverse the judgment below and remand the case for further proceedings.

### IV.

■■ Because we require further proceedings, it is not inappropriate for us to set forth guidelines to the district court in conducting them. The burden confronting defendants faced with a *prima facie* showing of discriminatory impact is different and more difficult than what they face when confronted with a showing of discriminatory intent. Defendants may overcome a *prima facie* showing of discriminatory intent by articulating some "legitimate non-discriminatory reason for the challenged practice." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). However, when confronted with a showing of discriminatory impact, defendants must prove a business necessity sufficiently compelling to justify the challenged practice. *Williams v. Colorado Springs School District #11,* 641 F.2d 835, 842 (10 Cir.1981); *Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971).[5] We have "frequently cited and

---

4. The statistical significance of these figures easily meets the standards employed by the Supreme Court in *Castenada v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), and *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977).

5. The four-prong *Clarkton* analysis should not be applied in this situation. *Clarkton, supra,* announced four critical factors to determine whether a violation of the Fair Housing Act has occurred. Those four factors are: (1) the strength of the plaintiff's showing of discriminatory effect; (2) any evidence of discriminatory intent, even if insufficient to show constitutional violations; (3) the defendant's interest in taking the action complained of; and (4) whether the plaintiff seeks affirmative remedies or merely to restrain the defendant from interference

with private property owners who wish to provide housing for minorities. As the last component of this analysis suggests, the *Clarkton* test has been applied only in situations where a public body is the defendant. Where, as here, a private entity is involved the analysis is more straightforward. The inquiry is whether either discriminatory intent or impact can be proved and, if either or both is proved, whether there is a legitimate non-discriminatory reason sufficient to overcome the showing of intent, or whether a compelling business necessity exists, sufficient to overcome the showing of disparate impact. Obviously, a business necessity test is inapplicable in situations where the defendant is a public entity. The *Clarkton* formulation similarly has no application to private defendants.

applied" the business necessity formulation in employment discrimination cases arising under Title VII. *Wright v. Olin Corporation,* 697 F.2d 1172, 1188 (4 Cir.1982); *Robinson v. Lorillard,* 444 F.2d 791, 798 (4 Cir.1971).

■ Because the district court found no *prima facie* case of discriminatory impact had been established, it never reached the question of whether there was a business necessity compelling enough to justify the eviction policy. In our view, the question is one for the district court in the first instance. Accordingly, we do not express any view as to whether the evidence is sufficient to sustain the business necessity defense, and remand the case for a determination of that issue.

REVERSED AND REMANDED.