### Lisa D. WILLIAMS, et al.

v.

### PORETSKY MANAGEMENT, INC., et al.

### Civil Action No. CCB–95–2051.

United States District Court,
D.  Maryland.

Oct. 15, 1996.

be denied as moot as a result of granting defendants' motion for summary judgment.

John P. Relman, Christine R. Ladd, Washington Lawyer's Committee for Civil Rights and Urban Affairs, Washington, DC and Monica Wagner, Margaret E. Johnson, Terris, Pravlik & Wagner, Washington, DC, for Plaintiffs.

Norman G. Schneider, Kamerow & Kamerow, PC, Washington, DC, for Defendants.

## MEMORANDUM OPINION

BLAKE, District Judge.

In this case, the plaintiff presents a novel question regarding the type of conduct actionable as discrimination on the basis of sex under the Fair Housing Act, 42 U.S.C. § 3601 *et seq.* Lisa D. Williams claims that the defendants, the real estate management company that manages Chevet Manor Apartments and its owners, violated the Fair Housing Act, 42 U.S.C. §§ 3604, 3617, because of sexual harassment committed by their employee. She asserts that Harry Little, the porter of Ms. Williams' apartment building, sexually assaulted her in the elevator of the building on July 23, 1993 and then in the laundry room later that same night. The harassment continued after Ms. Williams reported the incident: Mr. Little told other residents about Ms. Williams' complaint, accused her of trying to have him fired, and called her derogatory names. The apartment resident manager, to whom Ms. Williams reported the incident, nevertheless assigned Mr. Little to repair jobs that needed to be done in Ms. Williams' apartment. On Halloween in 1993, a group of masked men frightened Ms. Williams and her son and accused her of making trouble for Mr. Little. Ms. Williams complained following each incident. After the Halloween incident, she asked to be released from her lease, and the property manager refused her request. Ms. Williams is joined in her suit by the Fair Housing Council of Greater Washington (the "FHC"), an organization dedicated to ending discrimination in housing.

The defendants now seek summary judgment, arguing that they did not interfere with Ms. William's rights under the Fair Housing Act. First, the defendants argue that Ms. Williams has not made a prima facie case of discrimination in the rental of housing under 42 U.S.C. § 3604(a), because Ms. Williams was never denied the right to rent her apartment. Second, the defendants argue that Ms. Williams was never denied any of the privileges of her rental contract under 42 U.S.C. § 3604(b), because she had access to all parts of the apartment building and even used the "party room," a room available for use by the tenants, for her own surprise

birthday party after the alleged incidents occurred. Third, the defendants argue that Ms. Williams was never coerced, intimidated, or threatened because she made a discrimination claim, because she did not file her complaint until the fall of 1995 and no facts exist to show any intimidation, coercion, or threats against her since that time. Finally, relying heavily upon Ms. Williams' failure to report these incidents to the police, the defendants argue that the incident complained of was isolated and trivial and should not serve as a basis for recovery. The defendants also argue that the Fair Housing Council has no standing and that the plaintiffs are not entitled to an award of punitive damages. For the reasons that follow, the defendants' motion for summary judgment will be denied.

## BACKGROUND

Ms. Williams and her son Gary moved into apartment number 602 of the Chevet Manor Apartments in Oxon Hill, Maryland on or about March 1, 1993. (Defs.' Answer, Ninth Defense ¶¶ 9, 11.) On the evening of July 23, 1993, Ms. Williams was styling the hair of some friends in her apartment. (Williams Dep. at p. 96, Pls.' Ex. 2; Dandridge Aff., Pls.' Ex. 13.) About 7:30 p.m., Ms. Williams left her apartment to get some laundry from the apartment laundry room, located in the basement of the building. (Williams Dep. at p. 85, Pls.' Ex. 2.) When Ms. Williams entered the elevator to go down to the basement, Mr. Little, a man employed by Poretsky management to do minor repairs in the building, was already on the elevator. (Id. at pp. 85–87.) While they were in the elevator together, Mr. Little touched or grabbed Ms. Williams' buttocks. (Id. at pp. 87–89.) Ms. Williams immediately pushed Mr. Little away and told him never to touch her. (Id. at p. 89.) Mr. Little exited on the first floor, and Ms. Williams proceeded to the laundry room. (Id. at p. 90.) While Ms. Williams, who was leaning against a table, was waiting for some clothes to finish drying, Mr. Little entered the laundry room. (Id. at p. 92.) Mr. Little put one of his hands on each side of Ms. Williams and pinned her body against the table with his body. (Id. at p. 93.) Mr. Little attempted to kiss Ms. Williams. (Id.)

Ms. Williams fought against Mr. Little, but he continued to rub his body, including his penis, against her and would not let her go. (Id. at p. 94; Pls.' Ex. 6.) Ms. Williams was screaming and struggling. Eventually, she managed to free a hand and strike Mr. Little across the face. Mr. Little then ran out of the laundry room. (Williams Dep. at p. 94, Pls.' Ex. 2.) The following day, Mr. Little came to Ms. Williams apartment door and pounded on it, demanding that Ms. Williams speak to him. (Id. at pp. 111–13; Dandridge Aff., Pls.' Ex. 13.) Ms. Williams refused to answer the door.

On or about July 26, 1993, Ms. Williams delivered a letter, (Pls.' Ex. 6), to the resident manager of the Chevet Manor Apartments, Dan Paynter, that described the incidents on July 23, 1993 and July 24, 1993. (Williams Dep. at p. 50, Pls.' Ex. 2; Hampton Dep. at p. 48, Pls.' Ex. 14.) On or about July 29, 1993, Mr. Paynter met with Ms. Williams and a friend of Ms. Williams, Ms. Hampton. (Defs.' Answer, Ninth Defense ¶ 17.) Mr. Paynter assured Ms. Williams that Mr. Little either would be fired or transferred from Chevet Manor. (Williams Dep. at p. 53, Pls.' Ex. 2.) Mr. Paynter did meet with Mr. Little, but Mr. Little denied the allegations. (Paynter Dep. at p. 73, Pls.' Ex. 11.) Mr. Paynter reported this incident to the property manager, Don Thompson, and asked Mr. Little to stay away from Ms. Williams, (Id. at 75), but no other action was taken.

Instead of keeping Mr. Little away from Ms. Williams, Mr. Paynter continued to assign Mr. Little to do repairs in Ms. Williams' apartment. Later in July, Ms. Williams' air conditioning broke down. (Williams Dep. at p. 132, 178–79, Pls.' Ex. 2.) Mr. Paynter offered to send Mr. Little to do the work. (Id.) Because Ms. Williams refused to allow Mr. Little into her apartment, she was forced to wait over a month for the repairs to be done. (Id.) On September 27, 1993, Mr. Paynter assigned Mr. Little to repair a leaky faucet in Ms. Williams' apartment. (Paynter Dep. at pp. 110–11.)

When Mr. Little saw Ms. Williams in the apartment building, he harassed her verbally. As she walked past him one day in October,

Mr. Little, in a voice loud enough for her to hear, said that Ms. Williams was the bitch that was trying to get him fired. (Williams Dep. at pp. 261–63, Pls. Ex. 2.) On another occasion Mr. Little called Ms. Williams a freak. (*Id.*) Ms. Williams reported both incidents to Dan Paynter. (*Id.*)

On October 31, 1993, Ms. Williams and her son were approached by two men in masks whom she had seen earlier with Mr. Little. (*Id.* at pp. 136–39.) They tried to touch Ms. Williams and said that Mr. Little had told them she was a freak. (*Id.*) Ms. Williams managed to push past the men and enter her apartment. After this incident, she wrote a second letter of complaint to Mr. Paynter and asked to be released from her lease. (Pls. ' Ex. 7. ) Mr. Thompson, the property manager, refused to release Ms. Williams from her lease. (Thompson Dep. at pp. 40, 69–70, Pls.' Ex. 8.) In the middle of December 1993, Ms. Williams left her apartment. (Williams Dep. at p. 154, Pls.' Ex. 2.) In October and November of 1995, Dr. Elizabeth Morrison completed a psychological evaluation of Ms. Williams and diagnosed her as suffering from Post Traumatic Stress Disorder and Major Depression as a consequence of the events that occurred at Chevet Manor Apartments. (Report of Elizabeth Morrison, M.D., Pls.' Ex. 23.)

## ANALYSIS

### I. Standing of the Fair Housing Council of Greater Washington

Before addressing the merits of Ms. Williams' claim, the court must decide whether the Fair Housing Council of Greater Washington (the "FHC") has standing in this matter. Ms. Williams is joined in this suit by the FHC, a private, nonprofit organization dedicated to promoting equal housing opportunity and eliminating discriminatory housing practices based on race, color, religion, sex, national origin, familial status, or handicap. (Berenbaum Decl. ¶ 2, Pls.' Ex. 3.) The FHC has devoted significant resources to counseling Ms. Williams and investigating her complaint. (*Id.* ¶ 4.) To date, the FHC has spent over 122 hours on matters related to Ms. Williams' complaint and case, at a cost to the organization of $12,200. (*Id.*) The FHC claims that the defendants' discriminatory actions have caused the FHC to divert its scarce resources to identifying and counteracting the defendants' discriminatory practices, taking time and money from the FHC's usual educational and counseling activities. (*Id.* at ¶ 5.)

The Supreme Court has held that an organization has standing to sue in its own right under the Fair Housing Act when the alleged discriminatory practices have "perceptibly impaired" the organization's usual efforts against discrimination. *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124–25, 71 L.Ed.2d 214 (1982). In *Havens,* the discriminatory activity involved steering black potential tenants away from the defendants' apartment complexes. *Id.* at 367 The organization spent considerable time identifying and counteracting the discriminatory practices, by sending "testers" to the apartment complexes in question to find out if the "testers" would be offered housing. *Id.* at 368, 379, 102 S.Ct. at 1118–19, 1124–25. If not for the defendants' discrimination, the organization could have devoted its time and money to other activities. One circuit has emphasized that *"Havens* makes clear ... that an organization establishes Article III injury if it alleges that the purportedly illegal action increases the resources the group must devote to programs independent of its suit challenging the action." *Spann v. Colonial Village, Inc.,* 899 F.2d 24, 27 (D.C.Cir.), *cert. denied,* 498 U.S. 980, 111 S.Ct. 508, 112 L.Ed.2d 521 (1990). In *Spann,* the defendants were accused of placing advertising with white models to the exclusion of black models. *Id.* at 25. The court agreed that the organization had standing, however, and found that "increased education and counseling could plausibly be required ... to identify and inform minorities, steered away from defendants' complexes by the challenged ads, that defendants' housing is by law open to all." *Id.* at 28–29. In this circuit, at least one district court has further refined this standard, finding that "[w]hile it may be true that some of this time was spent on activities necessary to the instant lawsuit, such contention does not negate the establishment of standing." *Saunders v. General Servs.*

*Corp.,* 659 F.Supp. 1042, 1052 (E.D.Va.1987) (noting that the organization had spent considerable time, investigating the complaint and trying to resolve it).

Thus, an organization has standing under the Fair Housing Act when it demonstrates that it has: (1) devoted significant resources to identifying and counteracting the defendant's discriminatory practice; and (2) such practices have frustrated the organization's efforts against discrimination. *Saunders,* 659 F.Supp. at 1052. The ·FHC seems to have met this standard. It has devoted significant resources to identifying and counteracting the defendants' practices, and because time was spent on these efforts, the organization was prevented from spending time on other efforts to end discrimination in the housing area.

Paragraph 4 of Mr. Berenbaum's Declaration (Pls.' Ex. 3) describes in the most detail the FHC's activities leading up to the suit. Mr. Berenbaum states that time and money were spent investigating Ms. Williams' complaint to the FHC and on this case. (Berenbaum Decl. ¶ 4.) While investigating her complaint seems related to the development of this lawsuit, it also can be regarded as an independent activity associated with the identification and counteraction of the defendants' discriminatory practices. *See Ragin v. Harry Macklowe Real Estate Co.,* 6 F.3d 898, 905 (2d Cir.1993) (finding that the organization had standing where it had devoted substantial time to identifying the parties involved, attending a conciliation conference, and developing the lawsuit itself); *Village of Bellwood v. Dwivedi,* 895 F.2d 1521, 1526 (7th Cir.1990) ("[T]he only injury which need be shown to confer standing on a fair-housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination."). Thus, the FHC has demonstrated a palpable injury to itself and will be permitted to proceed.

## SUMMARY JUDGMENT STANDARD

Rule 56 (c) of the Federal Rules of Civil Procedure provides that summary judgment should be granted when there is no genuine dispute as to material fact, and the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its initial burden, the nonmoving party must set forth specific facts showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Adickes,* 398 U.S. at 160 n. 22, 90 S.Ct. at 1610 n. 22.

In deciding the motion, the court must view the material facts and the inferences properly drawn therefrom in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Adickes,* 398 U.S. at 158–59, 90 S.Ct. at 1609. Summary judgment is inappropriate, even where there is no dispute as to the basic facts, if the parties disagree on the inferences that may be drawn from the undisputed facts. *Morrison v. Nissan Co.,* 601 F.2d 139, 141 (4th Cir.1979). The substantive law identifies those facts, or inferences therefrom, that are material and also identifies the standard of proof against which the presence or absence of material factual dispute is to be gauged. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

## I. Sexual Harassment as a violation of the Fair Housing Act

Ms. Williams is asking this court to permit her to bring a claim of sex discrimination under the Fair Housing Act (Title VIII), because Mr. Little sexually harassed her and because of the harassment that she suffered after reporting the incident to the resident manager, Mr. Paynter. The Fourth Circuit has not yet decided the question whether a plaintiff may recover for sexual harassment under the Fair Housing Act's prohibition against sex discrimination. Because the Fourth Circuit consistently has understood Title VII and Title VIII to provide similar protections, however, this court will recognize the cause of action and permit Ms. Williams to attempt to prove a claim on this basis.

To date, six other federal courts have considered whether a plaintiff should be permitted to bring a claim of sexual harassment under the Fair Housing Act. *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996) ("Like the Tenth Circuit, we recognize a hostile housing environment cause of action.... "); *Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir.1993) (holding that the sex-based discrimination prohibited in the Fair Housing Act includes sexual harassment); *Beliveau v. Caras*, 873 F.Supp. 1393, 1396 (C.D.Cal.1995) ("[I]t is beyond question that sexual harassment is a form of discrimination."); *New York ex rel. Abrams v. Merlino*, 694 F.Supp. 1101, 1104 (S.D.N.Y.1988) (recognizing sexual harassment as permissible cause of action under Fair Housing Act even where no loss of housing is claimed); *Grieger v. Sheets*, 689 F.Supp. 835, 840–41 (N.D.Ill.1988) (holding that sexual harassment is actionable under the Fair Housing Act); *Shelhammer v. Lewallen*, 1 Fair Housing–Fair Lending Cases (P–H) ¶ 15, 472, at 135 (W.D.Ohio 1983) ("I conclude that it is entirely appropriate to incorporate this doctrine [sexual harassment] into the fair housing area."), *aff'd*, 770 F.2d 167 (6th Cir.1985) (unpublished opinion). Each of these courts has had little trouble in finding that sexual harassment is a proper basis for recovery under the Fair Housing Act. *DiCenso*, at 1008; *Honce*, 1 F.3d at 1088; *Beliveau*, 873 F.Supp. at 1396; *Abrams*, 694 F.Supp. at 1104; *Grieger*, 689 F.Supp. at 840–41; *Shell-hammer*, 1 Fair Housing–Fair Lending Cases ¶ 15,472, at 136.

The courts generally rely upon three grounds in finding that sexual harassment claims are actionable under the Fair Housing Act. First, sexual harassment is actionable under Title VII in the employment context. Because Title VII and Title VIII share the same purpose—to end bias and prejudice—sexual harassment should be actionable under Title VIII. *See Beliveau*, 873 F.Supp. at 1397 ("[T]he purposes underlying Titles VII and VIII are sufficiently similar so as to support discrimination claims based on sexual harassment regardless of context."); *Abrams*, 694 F.Supp. at 1104 ("[T]he 'two statutes are part of a coordinated scheme of federal civil rights laws enacted to end dis-

crimination.' ") (quoting *Huntington Branch, NAACP v. Huntington*, 844 F.2d 926, 934 (2d Cir.1988)); *Shellhammer*, 1 Fair Housing–Fair Lending Cases ¶ 15, 472, at 135–36 ("[B]oth statutes are designed to eradicate the effects of bias and prejudice. Their purposes are, clearly, the same; only their field of operation differs."). Second, other courts have so held. *See DiCenso*, 96 F.3d 1004, 1008; *Beliveau*, 873 F.Supp. at 1396–97 ("Since *Shellhammer*, additional courts have agreed that sexual harassment is an actionable form of housing discrimination.") (citing to *Honce* and *Abrams*); *Abrams*, 694 F.Supp. at 1104 ("[T]he plaintiffs finds [sic] support from other jurisdictions in which courts have held that sexual discrimination under the Fair Housing Act encompasses claims of sexual harassment.") (citing to *Grieger* and *Shellhammer* ). Third, the Supreme Court has held that sexual harassment is a form of sex discrimination. *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986).

After reviewing these cases, few as they may be, it is not difficult to conclude that this court should recognize sexual harassment as actionable under Title VIII. The Fourth Circuit has recognized that sexual harassment is actionable under Title VII. *See Katz v. Dole*, 709 F.2d 251, 254 (4th Cir.1983). It also has recognized the shared purpose of Title VII and Title VIII to end discrimination. *See Betsey v. Turtle Creek Assocs.*, 736 F.2d 983, 987 (4th Cir.1984) ("We and other courts of appeals have recognized the parallel objectives of Title VII and Title VIII."). Moreover, in recognition of these similar aims, it has been willing to import doctrines· or interpretations of language accepted under Title VII to Title VIII claims. *See Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451 (4th Cir.) ("[W]e do not consider novelty a bar to the application of [a] doctrine [previously employed in fair employment contexts to fair housing contexts].") , *cert. denied*, 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990); *Smith v. Town of Clarkton, N.C.*, 682 F.2d 1055, 1065 (4th Cir.1982) (noting that "some courts have reasoned that since the antidiscrimination objec-

tives of Title VIII are parallel to the goals of Title VII, the ... rationale [applied in Title VII cases] must be applied in Fair Housing Act cases.... We agree with that analysis"). The defendants have cited no case holding that a plaintiff may not recover for sexual harassment under Title VIII, nor have the defendants offered any persuasive reasons for not holding this conduct actionable.

After recognizing this cause of action, the next issue is to determine what a plaintiff must demonstrate to make a prima facie case of sexual harassment. Under Title VII, courts have recognized two types of sexual harassment claims—*quid pro quo* and hostile environment. *See Katz,* 709 F.2d at 254; *Henson v. City of Dundee,* 682 F.2d 897, 908 n. 18 (11th Cir.1982). Ms. Williams is making a claim of hostile housing environment sexual harassment. (*See* Pls.' Opp'n at pp. 20–22.) The plaintiff urges the court to follow the standards promulgated in a HUD administrative decision, *HUD v. DiCenso,* HUD Admin. Decis. ¶ 25,101, at 25,909 (April 18, 1995), arguing that HUD's interpretation should be accorded great weight. (Pls.' Opp'n at p. 21.)[1] Other courts have turned to Title VII cases to guide them in deciding claims of sexual harassment under the Fair Housing Act. *See DiCenso,* 96 F.3d 1004, 1008 ("[We] begin our analysis with the more familiar Title VII standard."); *Honce,* 1 F.3d at 1088 ("[W]e will look to employment discrimination cases for guidance."). District courts in the Fourth Circuit also have turned to Title VII for guidance in determining the standards applicable to Title VIII claims. *See Williams v. 5300 Columbia Pike Corp.,* 891 F.Supp. 1169, 1178 (E.D.Va.1995) ("In evaluating Fair Housing Act claims, courts employ the same method of analysis used in Title VII employment discrimination cases."); *McCauley v. City of Jacksonville, N.C.,* 739 F.Supp. 278, 281 n. 2 (E.D.N.C.1989) (noting

that the standards for deciding claims under §§ 1981, 1982, and Title VII were the same, and thus, "[a]lthough this is not a Title VII action, the 'parallel goals' of Title VII and Title VIII make it appropriate to treat plaintiff's civil rights and Fair Housing act claims together"), *aff'd,* 904 F.2d 700 (4th Cir.1990).

■ In the Fourth Circuit, a prima facie case of hostile environment sexual harassment in the work place is made upon showing that: "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer." *Spicer v. Virginia Dep't of Corrections,* 66 F.3d 705, 710 (4th Cir.1995) (en banc); *accord Paroline v. Unisys Corp.,* 879 F.2d 100 (4th Cir.1989), *aff'd in relevant part, vacated on other grounds,* 900 F.2d 27 (1990) (en banc). A similar test should be applied in the hostile housing environment context.[2]

■ Applying the facts of Ms. Williams' case to the elements outlined above, the first, second, and fourth elements have been met. Mr. Little's conduct was unwelcome, and it was based on the sex of the plaintiff—but for her sex she would not have been subjected to the harassment. Moreover, this conduct was imputable on some basis to the defendants. Conduct is imputable to a landlord, if the landlord "knew or should have known of the harassment, and took no effectual action to correct the situation." *Katz,* 709 F.2d at 256; *accord Spicer,* 66 F.3d at 710. Indeed, in many circumstances under the Fair Housing Act, the duty not to discriminate is non-delegable, and an employer may be held responsible for the discriminatory conduct of his employees, even though the conduct was

---

**1.** The elements of the claim as stated by HUD are:

1. complainant is a member of a protected class;
2. complainant was subject to unwelcome sexual harassment;
3. the harassment complained of was based on sex;
4. the harassment complained of affected a term, condition, or privilege of housing;

5. if vicarious liability is asserted, the defendants knew or should have know of the harassment and failed to take prompt effective remedial action.

*DiCenso,* HUD Admin. Decis. at 25,909.

**2.** The third element may be stated as: whether the conduct is sufficiently severe or pervasive to alter the plaintiff's conditions of tenancy and to create an abusive living environment.

not authorized. *See Walker v. Crigler,* 976 F.2d 900, 904 (4th Cir.1992); *Saunders v. General Servs. Corp.,* 659 F.Supp. 1042, 1059 (E.D.Va.1987). Ms. Williams reported each incident to management at Chevet Manor, either orally or in writing. In response, the resident manager, Mr. Paynter, failed to transfer or fire Mr. Little as promised and continued to assign Mr. Little to do repairs in Ms. Williams' apartment. When she asked to be let out of her lease in November, Mr. Thompson, the property manager, refused to end the lease. Thus, on this record, it appears that the landlord knew or should have known of the incidents and took little, if any, action to correct the situation.

■ The third element, whether the harassment to which the plaintiff was subjected was sufficiently severe or pervasive to alter the plaintiff's conditions of tenancy and to create an abusive living environment, is less obvious. Viewing Ms. Williams' evidence in the light most favorable to her, however, it appears that a fact finder reasonably could find that it has been met. "To determine whether the harassment was sufficiently severe or pervasive, the fact finder must examine the evidence both from an objective perspective and from the point of view of the victim." *Paroline,* 879 F.2d at 105. As the Supreme Court recently has clarified,

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive ... environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's [environment]....

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20–22, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Ms. Williams has offered evidence that she perceived the events in question as significantly affecting her environment. (*See* Williams Dep. at pp. 131, 140, Pls.' Ex. 2; Report of Elizabeth Morrison, M.D., Pls.' Ex. 23.) Ms. Williams decided to move to avoid further harassment. (*Id.*) In addition, her doctor will testify that Ms. Williams suffers

from Post Traumatic Stress Disorder as a result of the harassment that she suffered and the indifference shown by the Chevet Manor management. (*Id.*)

Whether a reasonable person would have been detrimentally affected by the harassment to which Ms. Williams was subjected is "quintessentially a question of fact." *Paroline,* 879 F.2d at 105. Summary judgment should not be granted unless no fact finder reasonably could conclude that the conduct was so severe or pervasive as to create an abusive living environment. *Id.* The abusive environment can be established "only by looking at all the circumstances[:] ... the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [a tenant's living experience]." *Harris,* 510 U.S. at 23, 114 S.Ct. at 371.

In *Paroline v. Unisys Corp.,* the harasser, Mr. Moore, made suggestive remarks to the plaintiff and rubbed her back on one occasion. *Paroline,* 879 F.2d at 103. The culminating event occurred one afternoon in January when he drove the plaintiff home from the office. On the way he repeatedly tried to kiss her and upon arrival at her home insisted on coming in and began kissing the plaintiff and rubbing his hands up and down her back. *Id.* The plaintiff eventually persuaded him to leave. *Id.* The next day the plaintiff complained to management. *Id.* The court found that "[a] reasonable person could find such behavior not merely offensive, but traumatic as well." *Id.* at 105–06.

The facts of this case appear most similar to the facts of *Paroline.* Although in this case no harassment occurred leading up to the incidents in the elevator and the laundry room, those particular events were severe. Mr. Little pinned Ms. Williams against a table, rubbed his body against hers, and repeatedly attempted to kiss her, until she struck him. In addition, Mr. Little continued to harass Ms. Williams in retaliation after she reported the incident, calling her derogatory names and embarrassing her by repeating her accusations to other residents. The other defendants took no effectual action to correct the problem. Thus, while Ms.

Williams' claim may have lacked the pervasiveness sometimes evidenced in a hostile environment claim, *see e.g., Amirmokri v. Baltimore Gas and Elec. Co.,* 60 F.3d 1126, 1131 (4th Cir.1995) (holding the harassment was sufficiently pervasive because it occurred almost daily for six months), the severity seems to match that found in *Paroline.* In addition, Ms Williams was harassed over a period of three and a half months, until she left her apartment. In combination, these facts reasonably would support a finding of the required severity or pervasiveness.

■ This case involves a more serious incident than did *Raley v. Board of St. Mary's County Comm'rs,* 752 F.Supp. 1272 (D.Md. 1990), in which the court found that "various offensive touchings and other sexual innuendos" were not sufficiently severe or pervasive to support a claim for sexual harassment. *Id.* at 1275, 1280. In addition, as the plaintiffs point out, although courts have looked to employment cases to determine housing claims, the settings are not completely analogous. At least one court has recognized that sexual harassment in the home may have more severe effects than harassment in the workplace. *See Beliveau,* 873 F.Supp. at 1397 n. 1. Thus, Ms. Williams' claims sufficiently allege facts upon which a jury reasonably could find that the conduct alleged was sufficient to create a hostile environment. Accordingly, the defendants' motion for summary judgment will be denied.

## II. Punitive Damages

The defendants also complain that the plaintiffs are not entitled to an award of punitive damages as a matter of law. "Punitive damages are awarded in federal question cases when a defendant has acted 'with actual knowledge that he was violating a federally protected right or with reckless disregard of whether he was doing so.' " *Pinchback v. Armistead Homes Corp.,* 689 F.Supp. 541, 556 (D.Md.1988) (quoting *Miller v. Apartments and Homes of N.J., Inc.,* 646 F.2d 101, 111 (3d Cir.1981)) (refusing to award punitive damages where the defendants had been adequately punished through award of attorneys' fees), *cert. denied,* 498 U.S. 983, 111 S.Ct. 515, 112 L.Ed.2d 527 (1990); *accord Fen-*

*wick–Schafer v. Sterling Homes Corp.,* 774 F.Supp. 361, 366 (D.Md.1991) (permitting question of punitive damages to survive summary judgment stage because a sufficient dispute of fact existed as to the defendants' degree of knowledge).

■ In this case, Ms. Williams alleges that the defendants knew about Mr. Little's assault and took little action to remedy the harm. (Williams Dep. at p. 177, Pls.' Ex. 2.) Mr. Paynter continued to assign Mr. Little to perform repairs in Ms. Williams' apartment, despite her strenuous objections. (*Id.* at p. 178.) Ms. Williams also alleges that Mr. Paynter told her that this was not the first time the management had received complaints about Mr. Little. (*Id.* at 223.) Accordingly, it appears that a question of fact has been generated whether the defendants acted with "reckless disregard" of Ms. Williams' federal rights. A punitive damage award will not be precluded at this stage.

Accordingly, summary judgment is denied on all counts. A separate order follows.

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby Ordered that:

1. the defendants' motion for summary judgment is DENIED; and

2. the clerk shall mail copies of the accompanying Memorandum Opinion and this Order to all parties.