**Lyle KRUEGER, Petitioner,**

v.

**Andrew M. CUOMO, Secretary of the United States Department of Housing and Urban Development, Respondent.**

No. 96–2906.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1997.

Decided June 3, 1997.

Gerald A. Goldman, Arthur R. Ehrlich, Jonathan C. Goldman (argued), Chicago, IL, for Petitioner.

Jessica Dunsay Silver, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, Elizabeth Crowder, U.S. Department of Housing and Urban Development, Chicago, IL, Nelson Diaz, Department of Housing and Urban Development, Washington, DC, Michelle M. Aronowitz (argued), United States Department of Justice, Washington, DC, for Respondent.

Before FLAUM, KANNE, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Lyle Krueger petitions for review of a decision and order of the Secretary of the Department of Housing and Urban Development ("HUD") concluding that Krueger violated the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, by sexually harassing one of his tenants. We affirm.

## I.

In April 1992, Debbie Maze was living in Kenosha, Wisconsin with her two children, ages four and three, in her sister's two-bedroom apartment, also home to the sister's boyfriend and four children. Maze had been searching for an apartment for three months, and her section 8 housing voucher was due to expire in late May. So when she saw a "for rent" sign on an apartment owned by Lyle Krueger, she inquired within and found Krueger, who gave her a rental application and suggested they meet the next morning for breakfast.

At the breakfast meeting, it became apparent that Maze could not afford the three-bedroom, $547-a-month apartment, for her housing voucher provided only $395 for a two-bedroom apartment, to which she was expected to add a personal contribution of $52 per month. Although Krueger initially refused to rent the apartment to Maze, he soon changed his mind. He located Maze through her sister, a former tenant, and arranged for another breakfast meeting. At this second meeting, Krueger told Maze that she could pay money on the side or "fool around or something" to make up the $100 shortfall. She declined this payment scheme, but Krueger nevertheless agreed to rent her the apartment. Maze did not own a car, and Krueger gave her a ride home from their meeting. In his car, Krueger rubbed Maze's

thigh and predicted, "we're going to be close." Maze asked Krueger not to touch her.

On May 11, Krueger and Maze went to the Kenosha Housing Authority to sign a rental agreement. In the elevator on the way to the office, Krueger touched Maze, rubbed her, and tried to kiss her. She told him to stop, a request he greeted with laughter. After the two had signed the lease, an undaunted Krueger once again prophesied that he and Maze "were going to be real close." Maze was so disturbed by Krueger's behavior that, later the same day, she returned alone to the Housing Authority. There, she reported Krueger's advances to a Housing Authority official, Paula Lattergrass, who urged her not to take the apartment. Maze felt that she had few alternatives other than to move into the apartment, but she did, at the suggestion of Lattergrass, file complaints against Krueger with the Urban League and HUD.

Krueger's unwelcome advances continued after Maze moved into the apartment on May 13. He made a habit (three to four times a week, Maze recalled) of arriving unannounced; he would knock on the first-floor doorway, enter before Maze could respond, and climb the internal staircase to her apartment. Once inside, he would grab and touch Maze, doing so on at least one occasion in front of her children. He suggested that she send the children to her mother's so that she and Krueger could go away together. On another occasion, he repeated his hope that they would be "real close" and asked if they were "going to do good in bed." When Maze demurred, he told Maze that he was losing money because of her and reminded her that he could have rented the apartment to someone else. Krueger also asked Maze out for drinks. Maze, who is black, told Krueger, who is white, that she did not date white men. Four or five times, she observed him parked outside her home watching her apartment. Maze began to seek ways to minimize contact with Krueger. In order to do so, she brought her rent checks to Lattergrass, who forwarded them to Krueger.

Under these circumstances, it would be inapt to speak of a deterioration in the relationship between Krueger and Maze; but from Krueger's perspective at least, matters did take a turn for the worse after he learned that Maze had filed harassment charges against him. In a series of letters written during the summer of 1992, Krueger expressed his dissatisfaction with Maze as a tenant. These letters explicitly linked the perceived decline in their relations to Maze's filing of harassment charges against Krueger ("Before you moved in you were very friendly . . ., you were a pleasure to be with and then you filed sexual harassment charges."), informed Maze that Krueger would be willing to break the year-long lease, and repeatedly suggested that Maze "think about moving." The letters also referred to a ten-dollar fee, imposed as a result of the Housing Authority's purported delay in forwarding Maze's rent check, and to the cost of repairs made to the apartment, both of which Krueger intended to deduct from Maze's rent payments. In October, the letters became more official in tone. On October 20, Krueger informed Maze that, because lead had been detected in her children's blood, she would have to vacate the apartment and remove all of her belongings, including furniture, in order for him to take "corrective action." (In fact, Krueger only painted over the lead-based paint; Maze and her children were able to spend daytime hours at her mother's for the two or three days required to complete the painting.) The most recent letter in the record, dated October 22, 1992, came from Krueger's lawyer, who instructed Maze that she must either pay "unpaid rent" or vacate her apartment within five days.

As Krueger indicated in his letters, the "unpaid rent" represented the cost of repairs that he had deducted from Maze's rent payments, as well as the ten-dollar late fee. The repairs in question were the unclogging of Maze's toilet and sink and the replacement of her apartment door, which she had forced open after one of her children locked himself inside the apartment. Prior to Krueger's attempt to evict Maze, the landlord and tenant had met at the Housing Authority in an attempt to resolve the payment dispute, and Lattergrass had presented a compromise solution, under which Maze would pay for a

portion of the repairs. (Based on her inspection of the apartment, Lattergrass believed that Maze was only partly responsible for the plumbing difficulties and that the broken door had needed only a new lock, not complete replacement.) Nevertheless, Krueger refused to accept any money from Maze.

Krueger continued to sexually harass Maze after she became pregnant in October 1992. In February 1993, Maze moved out of her apartment and into her mother's home, a two-bedroom unit shared by Maze's stepfather and her brother. She did not find another apartment until May 1993.

Maze's complaint against Krueger came before an administrative law judge ("ALJ") in December 1995. After hearing testimony from Krueger, Maze, her sister Barbara Maze, Lattergrass, and a HUD investigator, the ALJ ruled in favor of Maze. In his decision and order, dated June 7, 1996, the ALJ noted that, in contrast to Debbie Maze's "straightforward, consistent, and credible" testimony, which was corroborated by Lattergrass and Barbara Maze, Krueger's testimony was "riddled with inconsistencies" and, in places, "simply ... not believable."[1] Significantly, the ALJ found that Krueger's conduct had caused Maze to move out of her apartment. Krueger "made Maze's tenancy untenable," in the ALJ's view; "Eventually the tenancy became so miserable that she felt compelled to move out." The ALJ also rejected Krueger's proffered explanations for his attempts to evict Maze (her hostility toward him, her failure to pay rent) and found that Krueger's actions were a direct response to her refusal to submit to his demands and to her filing of harassment charges. Because Maze's rejection of Krueger's advances resulted in an adverse consequence (i.e., being forced out of her apartment), the ALJ concluded that Krueger had engaged in *quid pro quo* sexual harassment. Accordingly, the ALJ held that Krueger had violated 42 U.S.C. § 3604(b), which forbids discrimination on the basis of sex "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection

therewith...." The ALJ also held that Krueger's continued campaign of harassment—an interference with Maze's right to quiet enjoyment of her tenancy—and his retaliation against Maze for her filing a complaint each independently violated 42 U.S.C. § 3617, which makes it "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed ... any right granted or protected by section ... 3604 ... of [Title 42]." Krueger was enjoined from committing future acts of discrimination, assessed a civil penalty of $10,000, and ordered to pay Maze $622 for alternative housing costs, $2,000 to compensate for the inconvenience occasioned by her loss of the apartment, and $20,000 for Maze's emotional distress. On July 7, 1996, the ALJ's ruling became the final order of the Secretary pursuant to 42 U.S.C. § 3612(h)(1). Krueger now appeals the agency's liability determination and argues that the damages and civil penalty are excessive.

## II.

Krueger's challenge to HUD's conclusion that he violated sections 3604(b) and 3617 warrants little discussion. This court has recognized that sexual harassment in the housing context can violate the Fair Housing Act, *see DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996), and Krueger does not argue otherwise. Moreover, although he purports to raise legal issues subject to our plenary review, the legal standards Krueger proposes do nothing to undermine the agency's analysis. Krueger's arguments ultimately rest on the assertion that he attempted to evict Maze for "legitimate business reasons" and that there was "no causal connection between Krueger's alleged sexual advances and her moving out of the apartment"—a view of the evidence directly in conflict with the ALJ's findings. From our perspective, those findings need only be supported by substantial evidence: "we may not decide the facts anew, reweigh the evidence, or substitute our own judgement for that of the Secretary." *Jancik v. Department of*

---

1. Krueger denied virtually all of the sexual harassment attributed to him by Maze. Our account of the underlying facts relies mainly on the ALJ's findings.

*Housing and Urban Development,* 44 F.3d 553, 556 (7th Cir.1995) (citations and internal quotations omitted). " '[A]n ALJ's credibility determinations'," we have explained, " 'will be overturned . . . only when extraordinary circumstances so require.' " *Dilling Mechanical Contractors, Inc. v. NLRB,* 107 F.3d 521, 524 (7th Cir.1997) (quoting *Carry Cos. of Illinois v. NLRB,* 30 F.3d 922, 926 (7th Cir.1994)). Certainly, no such "extraordinary circumstances" are present in this case, in which Maze buttressed her convincing testimony with the testimony of a disinterested witness (Lattergrass) to whom she had promptly reported the misconduct at issue. On this record, we have no basis for upsetting the agency's findings.

### III.

Krueger also argues that the civil fine assessed against him ($10,000) and the damages awarded Maze ($622 in alternative housing costs and $22,000 for emotional distress and inconvenience) were excessive.

 The ALJ based his award of alternative housing costs on Maze's estimate of her moving expenses and the rent she paid for three months to her mother and for one month to her new landlord, less the amount she would have had to contribute during this period under her lease with Krueger. On appeal, Krueger complains that Maze introduced no corroborating testimony or documentation and that the money Maze furnished her mother was not rent but went to pay the cable or phone bill. We, however, agree with HUD that the relevant inquiry is not how Maze's mother chose to apply the funds Maze contributed. Rather, it is enough that Maze paid this money in consideration of her being permitted to live in her mother's apartment. Further, Krueger has cited to us no authority for the proposition that Maze was required to document her alternative housing costs with exacting specificity, and we have not uncovered any. To the contrary, we believe that the ALJ was entitled to make a reasonable estimate, based on all of the evidence before him, of Maze's alternative housing costs. *Cf. Horn v. Duke Homes,* 755 F.2d 599, 607 (7th Cir.1985) ("The calculation is not precise, but unrealis-

tic exactitude is not required in this context . . . .") (discussing damages calculation in employment discrimination cases).

 Similarly, the evidence was sufficient to support the award of damages for emotional distress. Krueger observes that the direct evidence of Maze's emotional distress was limited almost entirely to her own testimony. He argues that because the ALJ's decision focused primarily upon Krueger's behavior, rather than Maze's reaction to that behavior, the award constitutes an unrequested, and therefore improper, punitive sanction. What Krueger neglects, however, is that the ALJ was obligated to "look at both the direct evidence of emotional distress and the circumstances of the act that allegedly caused the distress." *United States v. Balistrieri,* 981 F.2d 916, 932 (7th Cir.1992). "The more inherently degrading or humiliating the defendant's action is, the more reasonable it is to infer that a person would suffer humiliation or distress from that action; consequently, somewhat more conclusory evidence of emotional distress will be acceptable to support an award for emotional damages." *Id.* It demands little in the way of either empathy or imagination to appreciate the predicament of a woman who is harassed in full view of her children, whose home becomes not a sanctuary but the situs of her torment, and who concludes that she has no alternative but to leave a long sought-for apartment. Maze testified that Krueger made her feel "real dirty," "like a bad person," and "scared" her. She was not required, as Krueger appears to believe, to call an expert witness.

 Also without merit is Krueger's appeal of the Secretary's award of $2,000 to compensate Maze for her inconvenience. In ordering this relief, the ALJ noted that Maze had to search for new housing during the winter, to live for three months in crowded conditions in her mother's apartment, and eventually to accept a smaller, less well-heated apartment. Krueger's argument to this court—that Maze could have moved during the summer, when Krueger "actually tried to evict her" and that she "did not have to move in with her mother," but "could have waited

and moved into a new apartment"-contradicts itself. Worse, it ignores both the limited options available to Maze and the egregiousness of Krueger's misconduct. From all that appears, Maze dealt as well as could be expected with an intolerable situation.

 Finally, we are not persuaded that the $10,000 civil fine—the maximum penalty authorized under the governing statute, *see* 42 U.S.C. § 3612(g)(3)(A)—was excessive. In opposition to this fine, Krueger contends that "to pay this civil penalty, he would have to sell one of [his four] properties, which is too severe a penalty for [his] alleged conduct." Yet difficulty paying is not inability to pay, and a painless sanction would have little deterrent effect. In arriving at the $10,000 figure, the ALJ did consider Krueger's financial resources, as well as the seriousness of his misconduct and the need to deter him and other landlords from repeating the harassment that Maze experienced. Section 3612(g)(3) of Title 42 authorizes civil penalties "to vindicate the public interest," and the ALJ acted well within his authority in imposing the maximum fine available.

The order of the Secretary is AFFIRMED.