**UNITED STATES of America,
Plaintiff,**

v.

**John R. KOCH, Defendant.**

**No. 8:03 CV 406.**

United States District Court,
D. Nebraska.

Dec. 22, 2004.

Allen W. Levy, Rachel Levinson, Rigel C. Oliveri, Washington, DC, Laurie A. Kelly, Omaha, NE, for Plaintiff.

Brian D. Nolan, Nolan, Olson Law Firm, Justin D. Eichmann, Bradford, Coenen Law Firm, Matthew L. McBride, III, Susan Ann Koenig, Omaha, NE, for Defendant.

## MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

URBOM, District Judge.

On October 2, 2003, Plaintiff United States of America filed a complaint alleging that Defendant John R. Koch engaged in a pattern or practice of housing discrimination in violation of Title VIII of the Civil Rights Act of 1968 (Fair Housing Act) (FHA), as amended, 42 U.S.C. §§ 3601 *et seq.* More specifically, the complaint alleges, *inter alia*, that "[s]ince at least 1996 through the present, the defendant has subjected numerous female tenants and prospective female tenants of the rental properties owned and/or managed by defendant ... to severe, pervasive, and unwelcome verbal and physical sexual advances." (Compl., filing 1, ¶ 6.) This matter proceeded to trial, and at the conclusion of the plaintiff's case in chief, the defendant moved for judgment as a matter of law on certain claims. (*See* filing 102). This motion was renewed at the

close of evidence. (*See* filing 110.) For the following reasons, I find that the motion must be denied.

## I. STANDARD OF REVIEW

 Judgment as a matter of law may only be granted when "no reasonable juror could have returned a verdict for the non-moving party." *United States v. Big D Enterprises, Inc.*, 184 F.3d 924, 929 (8th Cir.1999) (citing *Rockwood Bank v. Gaia*, 170 F.3d 833, 840–41 (8th Cir.1999)). I must:

1) consider the evidence in the light most favorable to the non-moving party, 2) assume that all conflicts were resolved in favor of the non-moving party, 3) assume as proved all facts that the non-moving party's evidence tended to prove, 4) give the non-moving party the benefit of all favorable inferences that may reasonably be drawn from the proved facts, and 5) deny the motion unless all the evidence points one way and is susceptible of no reasonable inferences sustaining the non-moving party's position.

*Gaia*, 170 F.3d at 841 (citing *Denesha v. Farmers Insurance Exchange*, 161 F.3d 491, 497 (8th Cir.1998)). All of the evidence in the record, and not just the evidence in favor of the nonmoving party, must be reviewed by a court entertaining a motion for judgment as a matter of law. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

## II. ANALYSIS

### A. Whether Acts that Occurred After the Aggrieved Persons Took Possession of Rental Properties are Actionable Under the Fair Housing Act

The defendant first "seeks judgment as a matter of law on all post-residence acquisition Fair Housing Act [c]laims asserted pursuant to 42 U.S.C. § 3604(a-c) as they cannot be maintained under the plain language of the statute." (Filing 102 at 2.) In addition, the defendant claims that these "post-residence acquisition" claims cannot proceed under 42 U.S.C. § 3617. (*See id.* at 4–6.) In other words, the defendant argues that to the extent the aggrieved persons claim that they suffered discriminatory treatment *after* they moved into the defendant's properties, their claims cannot be maintained under sections 3604 or 3617 of the Fair Housing Act.

I find that the defendant's argument is precluded by *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 364 (8th Cir.2003), wherein the court concluded that "disability harassment in the housing context is actionable under the FHA ...." In *Neudecker*, the plaintiff, who suffered from obsessive-compulsive disorder (OCD), filed a complaint against the owner of the apartment building in which the plaintiff resided. *See id.* at 362–63. The plaintiff alleged, *inter alia*, that the defendant's employees disseminated the plaintiff's private medical information to tenants; that the plaintiff suffered disability-based harassment at the hands of the son of the apartment building manager and the daughter of the assistant manager; that after the plaintiff complained about the harassment, the manager and assistant manager retaliated against the plaintiff; and that the property manager threatened to evict the plaintiff " 'as reprisal' for his continued complaints about being harassed." *Id.* at 363. Clearly, the plaintiff's claims were based upon actions that occurred during his twenty-three year tenancy at the defendant's apartment building; thus, they were "post-residence acquisition" claims, as that term is used by Koch. Noting that "[t]he FHA prohibits discrimination, based on handicap, against any person with respect to the rental of a dwelling or the provision of related services or facilities," *id.* (citing 42

U.S.C. § 3604(f)), and citing decisions in which "federal courts have permitted claims under the FHA when sexual harassment causes a hostile housing environment," *id.* at 364 (citing *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir.1996); *Honce v. Vigil*, 1 F.3d 1085, 1088–90 (10th Cir.1993); *Williams v. Poretsky Mgmt., Inc.*, 955 F.Supp. 490, 495–96 (D.Md. 1996)), the Eighth Circuit concluded that the plaintiff's allegations were sufficient to state an "independent claim for disability harassment under the FHA," *id.* The court also concluded that the plaintiff sufficiently alleged a retaliation claim under section 3617, "because he asserted that [the defendant's] representative threatened to evict him as a reprisal for his complaints that tenants were engaging in disability harassment." *Id.* at 363–64.

Since the Eighth Circuit has found that "post-residence acquisition" claims based upon a tenant's disability are cognizable under sections 3604 and 3617, and in view of the court's reliance upon cases authorizing FHA claims based upon sexually-hostile housing environment allegations, I believe that the court would reject Koch's assertion that the aggrieved persons'

"post-residence acquisition" claims "cannot be maintained under the FHA."

In support of his position, the defendant relies chiefly upon the district court's and Seventh Circuit's opinions in *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n.*, 208 F.Supp.2d 896 (N.D.Ill. 2002), *rev'd in part*, 388 F.3d 327 (7th Cir.2004).[1] Since the Seventh Circuit criticized the Eighth Circuit's opinion in *Neudecker*, *see* 388 F.3d at 329, a careful examination of the *Halprin* opinions is in order. In *Halprin*, the co-owners of a home located in the Prairie Single Family Homes subdivision filed a complaint against several defendants, including the subdivision's homeowners' association and a Mr. Ormond, who was a resident of the subdivision and a member and officer of the homeowners' association. The complaint was based upon a number of incidents, including Mr. Ormond's alleged vandalism of the plaintiffs' home; the defendants' alteration and destruction of records in an attempt to conceal Ormond's threats against the plaintiffs; the defendants' threats to force the plaintiffs to sell their home due to an alleged violation of the association's covenants;[2] the defendants' application of unwanted chemicals to the

---

1. I have studied too the additional authorities that the defendant cites in support of his position, (*see* filing 102 at 2–6 (citing, *inter alia, South–Suburban Housing Center v. Greater South Suburban Board of Realtors*, 935 F.2d 868, 882 (7th Cir.1991); *King v. Metcalf 56 Homes Ass'n, Inc.*, No. 04–2192–JWL, 2004 WL 2538379 (D.Kan. Nov. 8, 2004); *Clifton Terrace Associates v. United Technologies Corp.*, 929 F.2d 714, 720 (D.C.Cir.1991); *Farrar v. Eldibany*, No. 04 C 3371, 2004 WL 2392242, 2004 U.S. Dist. LEXIS 20793 (N.D.Ill. Oct. 14, 2004); *Lawrence v. Courtyards at Deerwood Association, Inc.*, 318 F.Supp.2d 1133, 1141–1143 (S.D.Fla.2004); *Cox v. City of Dallas*, No. Civ.A 398CV1763BH, 2004 WL 370242 (W.D.Tex. Feb.24, 2004); *Matthews v. New Century Mortgage Corp.*, 185 F.Supp.2d 874, 885 (S.D.Ohio 2002))), many of which the defen-

dant conscientiously included in an index of evidence, (*see* filing 107 (including also *Taal v. Zwirner*, No. 02–131–M, 2004 WL 556709, 2004 U.S. Dist. LEXIS 4546 (D.N.H. March 22, 2004); *Moton v. Protine*, No. 02 C 8591, 2004 WL 609312, 2004 U.S. Dist. LEXIS 4883 (N.D.Ill. March 23, 2004); *Whisby–Myers v. Kiekenapp*, 293 F.Supp.2d 845 (N.D.Ill.2003); *Ross v. Midland Management Co.*, No. 02 C 8190, 2003 WL 21801023 (N.D.Ill. Aug. 1, 2003))), but it seems to me that these cases support no argument that has not been addressed in my analysis of the *Halprin* decisions, or are otherwise clearly distinguishable from the instant case.

2. This alleged violation was based upon the plaintiffs' posting of a sign that offered a reward for information identifying the vandals of their home.

plaintiffs' lawn; and the defendants' enactment of "several new rules targeted solely at restricting the freedom of plaintiffs to enjoy the use of their home." *Halprin,* 208 F.Supp.2d at 899. "[T]he entire campaign of harassment was caused or at least influenced by the religion of the Jewish plaintiff." *Halprin,* 388 F.3d at 328.

The plaintiffs alleged that the defendants' actions amounted to violations of 42 U.S.C. §§ 3604(b)-(c) and 3617. The district court disagreed and dismissed each of these claims. According to the court, the plaintiffs' complaint failed to state a claim under section 3604(b) because "Plaintiffs already owned their home and none of plaintiffs' allegations involve the sale or rental of housing." *Halprin,* 208 F.Supp.2d at 901 (quoting 42 U.S.C. § 3604(b) (emphasis omitted)). For the same reason, the court concluded that the complaint failed to state a claim under section 3604(c). *Id.* at 901–03. Finally, the court determined that the section 3617 claim ought to be dismissed for two reasons. First, the court noted that "the Seventh Circuit has instructed that when the alleged violation of § 3617 involves the same conduct and the same party responsible for a violation of § 3604, and the court finds the underlying § 3604 claim meritless, the court should also find the § 3617 claim meritless." *Id.* at 903. Since the plaintiffs failed to state a claim under section 3604, the court held that the section 3617 claim must also fail. Secondly, the court concluded that the plaintiff's allegations were not severe enough to support a claim under section 3617, because that

section only applies to "threatening, intimidating, or extremely violent discriminatory conduct designed to drive an individual out of his home," such as "cross-burning, fire-bombing homes or cars, shooting shotguns, physical assaults, or throwing Molotov cocktails." *Id.* at 904–04 (citations omitted).[3]

On appeal, the Seventh Circuit affirmed the district court's conclusion that the plaintiffs failed to state a claim under section 3604, stating, "Our plaintiffs ... are complaining not about being prevented from acquiring property but about being harassed by other property owners." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 329 (7th Cir.2004). The court noted that "[a]cts of post-sale discrimination have been litigated successfully under the Act," but found that the "Act's applicability to such discrimination" was not discussed in those cases. *Id.* The court also acknowledged that other circuit courts of appeals, including the Eighth Circuit in *Neudecker,* have drawn analogies between the FHA and Title VII and found that certain harassment claims are viable under the FHA; however, the court disregarded these cases, stating that "in none of these cases did the court consider the difference in language between the two statutes," and "[n]one of the ... cases contains a considered holding on the scope of the Fair Housing Act in general or its application to a case like the present one in particular." *Id.* (emphasis omitted). The court then

**3.** Parenthetically, I note that a contradiction inheres in the court's dual bases for dismissing the plaintiffs' section 3617 claims. Specifically, if it is true that a person who already owns his home has no section 3617 claim (because he cannot state a meritorious claim under section 3604), it is difficult to see how the severity of the means employed to drive the person from his home can give rise to an

actionable claim. Indeed, it seems to me that the court's first basis for dismissing the plaintiffs' section 3617 claim strongly implies-if not dictates-that firebombings, cross-burnings, assaults, and acts of vandalism motivated by unlawful discrimination are not actionable under the FHA if they occur after the victim takes possession of his home.

presented its own analysis of the scope of the FHA, stating,

> Title VII protects the job holder as well as the job applicant, so an employer who resorts to harassment to force an employee to quit is engaged in job discrimination within the meaning of the Act. The Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing. Behind the Act lay the widespread practice of refusing to sell or rent homes in desirable residential areas to members of minority groups. Since the focus was on their exclusion, the problem of how they were treated when they were included, that is, when they were allowed to own or rent homes in such areas, was not at the forefront of congressional thinking. That problem-the problem not of exclusion but of expulsion-would become acute only when the law forced unwanted associations that might provoke efforts at harassment, and so it would tend not to arise until the Act was enacted and enforced. There is nothing to suggest that Congress was trying to solve that future problem, an endeavor that would have required careful drafting in order to make sure that quarrels between neighbors did not become a routine basis for federal litigation.

*Id.* (citations omitted). Thus, the Seventh Circuit concluded that the "plaintiffs have no claim under section 3604." *Id.* at 330.

Although the court suggested that the absence of a viable section 3604 claim "might seem to doom [the plaintiffs'] claim under section 3617 as well, because that section provides legal protection only against acts that interfere with one or more of the other sections of the Act," it. nevertheless reversed the district court's

holding that the plaintiffs had no claim under section 3617. *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 330 (7th Cir.2004). The court explained its decision by noting that "a regulation issued by the Department of Housing and Urban Development ... in the name of section 3617 forbids among other things 'threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons." *Id.* (quoting 24 C.F.R. § 100.400(c)(2)). The court suggested that this regulation might be invalid, but concluded that the defendant's failure to challenge the regulation's validity eliminated this basis for affirming the district court's decision. *See id.* Finally, the court rejected the district court's conclusion that only violent acts, such as cross-burnings or assaults, are sufficiently severe to support a section 3617 claim. *See id.* (citing *Ohana v. 180 Prospect Place Realty Corp.,* 996 F.Supp. 238 (E.D.N.Y.1998)).

■ The defendant asks that I apply in this case the rules derived in *Halprin.* More specifically, the defendant argues that to the extent the aggrieved persons' claims are based upon incidents that occurred after they took possession of the rental properties, their claims cannot proceed under 42 U.S.C. § 3604. In addition, the defendant argues that these claims cannot proceed under section 3617 because 24 C.F.R. § 100.400(c)(2) is invalid.[4] For the following reasons, I reject the defendant's arguments.

■ First, as I have stated above, the Eighth Circuit has held that a plaintiff can

---

**4.** I note that this argument depends upon the assumption that post-possession claims cannot proceed under section 3617, standing

alone. This assumption is supported, albeit in different ways, in both *Halprin* decisions. *See* 208 F.Supp.2d at 903, 388 F.3d at 330.

base a section 3604 or 3617 claim on discriminatory acts that occurred after housing had been acquired. *See Neudecker v. Boisclair Corp.,* 351 F.3d 361 (8th Cir. 2003).

Second, after studying the *Halprin* opinions, I find that I am not persuaded by their analyses of the intended scope of Title VIII. Specifically, it seems to me that the courts' analyses are questionable in two key respects: they counsel that a narrow interpretation ought to be given to the language of section 3604, and they depend greatly upon a narrow view of the FHA's legislative history. I shall elaborate upon each of these criticisms in turn.

In *Halprin,* the district court interpreted the terms of section 3604(b) narrowly, holding that the prohibition of discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," cannot be read to apply to acts of discrimination that occur after a home is sold. *Halprin,* 208 F.Supp.2d at 901. However, there is authority that the terms of the Fair Housing Act are to be construed generously in order to promote the replacement of segregated ghettos with "truly integrated and balanced living patterns." *Trafficante v. Metropolitan Life Insurance Co.,* 409 U.S. 205, 211–12, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972) (quoting 114 Cong. Rec. 3422. (1968)); *City of Edmonds v. Oxford House Inc.,* 514 U.S. 725, 731, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995); *cf. Radecki v. Joura,* 114 F.3d 115, 116 (8th Cir.1997) (citing *Trafficante,* 409 U.S. at 211–12, 93 S.Ct. 364; *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 380, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). Indeed, the Seventh Circuit too has endorsed this prin-

ciple, *see Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1289 (7th Cir. 1977), although it was not acknowledged by either *Halprin* court.[5] In any event, the Seventh Circuit acknowledged in *Halprin* that post-sale discrimination might be encompassed within the statutory language of section 3604 "as a purely semantic matter," because the "'privileges of sale or rental' might conceivably be thought to include the privilege of inhabiting the premises." 388 F.3d at 329 (quoting 42 U.S.C. § 3604(b)). In my view, it is difficult to imagine a privilege that flows more naturally from the purchase or rental of a dwelling than the privilege of residing therein; therefore the Fair Housing Act should be (and has been) read to permit the enjoyment of this privilege without discriminatory harassment. *See Krueger v. Cuomo,* 115 F.3d 487, 491 (7th Cir.1997); *DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996); *Neudecker v. Boisclair Corp.,* 351 F.3d 361 (8th Cir.2003); *Honce v. Vigil,* 1 F.3d 1085, 1088–90 (10th Cir. 1993). Thus, and in view of the authorities counseling a broad interpretation of the language of the FHA, I cannot share the *Halprin* courts' cramped interpretation of the scope of section 3604(b).

I also disagree with the Seventh Circuit's analysis of the legislative history of the FHA. As I noted above, the court granted-albeit somewhat grudgingly-that section 3604(b) might be read to prohibit unlawful discrimination against the privilege of inhabiting the premises that one has purchased or rented. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 329 (7th Cir. 2004). However, the court relied upon the legislative history of the FHA to rule out

**5.** I note that *Metropolitan Housing Development Corp.* was cited by the district court for an unrelated proposition. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 208 F.Supp.2d 896, 903 (N.D.Ill.2002) (citing *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1288 n. 5 (7th Cir.1977)).

this interpretation, stating, "The Fair Housing Act contains no hint either in its language or its legislative history of a concern with anything but *access* to housing," and arguing that there is no reason to conclude that Congress gave any thought to problems that might arise when "[minorities] were allowed to own or rent homes" in "desirable residential areas." *Id.* I cannot agree with this assessment. With respect to the "language" of the Fair Housing Act, I note preliminarily that one need look no farther than its first section, as it was *initially* presented by Senator Mondale, to recognize that Congress was not unconcerned with the need to prevent discrimination that might arise during a person's occupancy of a dwelling:

It is the policy of the United States to prevent discrimination on account of race, color, religion, or national origin in the purchase, rental, financing, and *occupancy* of housing throughout the United States.

114 Cong. Rec. 2270 (1968) (emphasis added). The wording of this statement of policy was later changed, *see* 42 U.S.C. § 3601, but it cannot be said that at the

time of the congressional debates, Congress gave no thought to "post-possession" problems, such as harassment or expulsion.[6] Furthermore, at least one provision of the FHA deals expressly with problems that arise after home ownership has been secured. *See* 42 U.S.C. 3605 (barring discrimination in "real estate-related transactions," which include, *inter alia*, "[t]he making ... of loans ... for ... improving, repairing, or maintaining a dwelling ....."). Thus, it seems to me that the language of the FHA does demonstrate that Congress was concerned with post-possession discrimination.

As for the legislative history of the FHA, it is true that the congressional records reflect a deep concern about exclusionary housing practices; in particular, it is clear that the legislation was motivated by a desire to eliminate discriminatory business practices that confined African-Americans to harsh inner-city living conditions. *See generally* 114 Cong. Rec. 2274–84, 2703–09, 3421–22. However, it does not necessarily follow that Congress did not intend for the FHA to reach discrimination that occurs after housing has been

---

6. Nor can it be said that the current statement of policy rules out any prohibition of post-possession discrimination. *See* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."). In *Cox v. City of Dallas*, No. Civ.A 398CV1763BH, 2004 WL 370242 (W.D.Tex. Feb. 24, 2004), which the defendant cites at page four of his motion for judgment as a matter of law, (filing 102), the district court quoted section 3601 and stated, "In commenting upon the import of that declaration, Senator Mondale explained, 'Obviously, this [§ 3601] is to be read in context with the entire bill, the objective being to eliminate discrimination in the sale or rental of housing .... Without doubt, it means to provide for what is provided in the bill. It means the elimination of discrimination in the sale or rental of housing. That is all it could possibly mean.' " *Id.* at 2004 WL 370242 *8 (quoting

114 Cong. Rec. 4975 (1968)). The court uses this language to support its view that section 3604(b) applies only to discrimination which precludes ownership of a dwelling. *See id.* at 2004 WL 370242 *7–8. However, the court's broken quote avoids the context of Senator Mondale's comments. Senator Mondale was responding to Senator Murphy's concern that the words, "to provide for fair housing throughout the United States," could be read to mean "to give the housing" or "make it available." 114 Cong. Rec. 4975 (1968). In *other words*, Senator Mondale's comments were designed to respond to a colleague's concern that section 3601 could be read to require the United States to give housing or make housing available throughout the country. When they are viewed in context, I do not believe that Senator Mondale's words support the view that the FHA is limited to pre-possession discrimination.

acquired. On the contrary, Congress was "committed to the principle of living together," and sought to promote integrated neighborhoods where residents of different races would live together in "harmony." *Id.* at 2275–76, 2279. Congress hoped that its promotion of these principles would lead to the reduction of the deleterious effects of ghettos on the employment and education of the Americans trapped therein. *See id.* at 2276. To achieve these goals, Congress sought to pass "measures that have teeth and meaning, in the eyes of every American, black or white." *Id.* at 2275. It seems to me that little progress could have been made toward Congress's goals-and its measures would appear to have few teeth-if the basic privilege of residing within one's home were not protected from the evils of discriminatory harassment.

In sum, it is the Seventh Circuit's view that Congress sought to allow members of minority groups to acquire housing without facing discrimination but was not concerned with allowing such people to live in that housing without facing discrimination. I do not believe that this interpretation of the scope of the FHA is mandated by the Act's language or its legislative history. On the contrary, a broad interpretation of the FHA that encompasses post-possession acts of discrimination is consistent with the Act's language, its legislative history, and the policy "to provide . . . for fair housing throughout the United States." 42 U.S.C. § 3601.

◼ Third, I am not persuaded by the courts' analysis of the scope of section

3617. *See Halprin,* 208 F.Supp.2d 896, 903 (N.D.Ill.2002); 388 F.3d 327, 330 (7th Cir.2004). That section states,

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.

42 U.S.C. § 3617. To the extent that the *Halprin* courts hold that a violation of section 3617 cannot lie absent a violation of section 3603, 3604, 3605, or 3606,[7] I respectfully disagree. As another district judge in this circuit has aptly noted, "such a construction renders § 3617 a redundant section." *United States v. Pospisil,* 127 F.Supp.2d 1059, 1063 (W.D.Mo.2000). Similarly, other circuit courts have concluded that section 3617 may be violated when "no discriminatory housing practice may have occurred at all." *United States v. City of Hayward,* 36 F.3d 832, 836 (9th Cir.1994) (quoting *Smith v. Stechel,* 510 F.2d 1162, 1164 (9th Cir.1975)); *see also Sofarelli v. Pinellas County,* 931 F.2d 718, 722 (11th Cir.1991) (allowing section 3617 claim to proceed based upon allegations of interference with efforts to aid or encourage a purchaser's right to housing under section 3604). I agree with these decisions, and I find that even if section 3604 were given a narrow interpretation, such that it does not prohibit post-possession discrimination, it does not necessarily follow that no violation of section 3617 can lie.[8] Furthermore, I conclude that the

---

7. The Seventh Circuit stated, "So the plaintiffs have no claim under section 3604. And this might seem to doom their claim under section 3617 as well, because that section provides legal protection only against acts that interfere with one or more of the other sections of the Act that are referred to in section 3617 . . . ." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 330 (7th Cir.2004).

8. For example, if a woman rents an apartment-ostensibly pursuant to the same lease terms that are provided to all other tenants-it seems to me that she has exercised her right to obtain a dwelling without discrimination

plain language of section 3617 should be read to prohibit unlawful discriminatory conduct after a person has taken possession of a dwelling. This interpretation of the scope of section 3617 is shared, at least implicitly, by courts that have recognized harassment claims under the FHA, *see, e.g., Krueger v. Cuomo,* 115 F.3d 487, 491 (7th Cir.1997); *Neudecker v. Boisclair Corp.,* 351 F.3d 361, 363–64 (8th Cir.2003), and by courts that have found that section 3617 prohibits discriminatory conduct designed to drive people from their homes, such as cross-burnings, *see, e.g., Pospisil,* 127 F.Supp.2d at 1061–63; *Stirgus v. Benoit,* 720 F.Supp. 119, 123 (N.D.Ill.1989); *Johnson v. Smith,* 810 F.Supp. 235, 238–39 (N.D.Ill.1992).

■ Finally, even under *Halprin,* the defendant's argument that all "post-residence acquisition" claims must be dismissed hinges upon the validity of the regulation setting forth the Department of Housing and Urban Development's (HUD's) interpretation of section 3617. *See Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 330 (7th Cir.2004); *see also* 24 C.F.R. § 100.400(a). This regulation states, in relevant part, that "[c]onduct made unlawful under [section 3617] includes ... [t]hreatening, intimidating or interfering with persons *in their enjoyment of a dwelling* because of the race, color, religion, sex, handicap, familial status, or national origin of such persons ...." 24 C.F.R. § 100.400(c)(2) (emphasis added). Since the regulation forbids discrimination that occurs after a person has taken possession of a dwelling, the aggrieved persons' "post-residence acquisition" claims

may proceed under section 3617 if the regulation is valid.

I begin my analysis of the validity of section 100.400(c) with the familiar principles set forth by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction of the statute, as would be necessary in the absence of administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (footnotes omitted). It seems to me that Congress has not directly spoken to the precise issue of whether section 3617 makes it unlawful to "intimidate, threaten, or interfere with" a person in her enjoyment of a dwelling because of her sex; at

---

on account of her sex. This right is protected by section 3604, although there has been no violation of this right. If, however, after she has taken possession of the property, she is then subjected to discriminatory acts based upon her sex, it seems to me that she should

be allowed to prove that she experienced interference-if not threats, intimidation, or coercion-on account of her having exercised or enjoyed her right of access to housing protected by section 3604.

least, the issue is not free from doubt. Therefore, I must determine whether HUD's regulation "is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. 2778.

"The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.

*Chevron, U.S.A., Inc.,* 467 U.S. at 843–44, 104 S.Ct. 2778 (quoting *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)) (footnote omitted). Here, Congress has not explicitly left a gap for HUD to fill; therefore, section 100.400(c)(2) will be deemed valid if it is a reasonable interpretation of the legislation to which it relates. *See Chevron, U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. 2778; *Ragsdale v. Wolverine Worldwide, Inc.,* 218 F.3d 933, 936 (8th Cir.2000). I will reject the regulation as invalid if it is "contrary to clear congressional intent." *Ragsdale,* 218 F.3d at 936 (quoting *Chevron, U.S.A., Inc.,* 467 U.S. at 843 n. 9).

After carefully considering the Fair Housing Act, its stated purpose, and its legislative history, I find that 24 C.F.R. § 100.400(c)(2) is a reasonable interpretation of section 3617. I see no indication that it is contrary to Congress's intent in enacting the Fair Housing Act. Therefore, I conclude that the regulation is not invalid, and that it provides a vehicle for the aggrieved persons' "post-residence acquisition" claims to proceed under section 3617.

In sum, for the foregoing reasons I reject the defendant's arguments that the aggrieved person's "post-residence acquisition" claims cannot proceed under either section 3604 or 3617.

## B. Whether the Evidence is Sufficient to Support the Aggrieved Persons' Claims

The defendant argues,

Should this Court determine that the challenged HUD regulation is valid, all § 3617 claims of the Aggrieved Persons fail as containing insufficient evidence as a matter of law and are nowhere near the levels identified in *Halprin* and *Ohama* [sic] as threatening, intimidating, or interfering to justify intervention through the FHA. There are no allegations of physical threats, intimidation, vandalism, etc. Submitting these claims to the jury would be improper as a matter of law.

(Filing 102 at 7.) In addition, the defendant argues that the aggrieved persons' claims, "whether analyzed by § 3604, § 3617, or 'quid pro quo' or 'hostile environment,' fail as a matter of law." (*Id.* at 8.)

Preliminarily, I note that I disagree with the defendant's suggestion that an aggrieved person cannot prevail on a section 3617 claim without evidence of physical threats, intimidation, or vandalism. As the Seventh Circuit stated in *Halprin,* "There are other, less violent but still effective, methods by which a person can be driven from his home and thus 'interfered' with in his enjoyment of it." *Halprin v. Prairie Single Family Homes of Dearborn Park Association,* 388 F.3d 327, 330 (7th Cir.2004). Sexual harass-

ment amounts to one such method. *See id.* (citing *Krueger v. Cuomo*, 115 F.3d 487, 490–91 (7th Cir.1997)). In this case, the aggrieved persons' sexual harassment claims, whether brought pursuant to section 3604 (either as pre- or post-possession claims) or section 3617, are to be analyzed under a framework derived from Title VII cases. *See Neudecker v. Boisclair Corp.,* 351 F.3d 361, 364 (8th Cir.2003) (discussing elements of disability-based hostile housing environment cause of action); *see also DiCenso v. Cisneros,* 96 F.3d 1004, 1008–09 (7th Cir.1996) (discussing elements sexually hostile housing environment cause of action); *Honce v. Vigil,* 1 F.3d 1085, 1088–90 (10th Cir.1993) (discussing elements of quid pro quo housing harassment and hostile housing environment causes of action).

■ With the foregoing in mind, I shall review the sufficiency of the evidence supporting each aggrieved persons' claims-excepting, of course, those aggrieved persons who have been awarded no damages by the jury. Hereafter I shall summarize the pertinent testimony of each aggrieved person, which constitutes sufficient evidence to support the claim of the person. In each instance the aggrieved person testified that the sexual advances or actions of John Koch were unwelcome and were made without any inducement on her part.

### 1. Lisa Carroll

About six months after she moved into one of his rental houses, John Koch grabbed and held her breasts for two or three seconds. She was hurt by the incident, finding that afterward she was unable to let doctors or nurses touch her breasts.

### 2. Ebony Dishmon

When she refused his offer to cancel her overdue rent in exchange for sex, John Koch evicted her. His propositioning her

made her feel bad and she now finds it hard to trust people, has talked with a counselor, has felt her life has been in the palms of Koch's hands and she has been depressed.

### 3. Penny Goforth

She was going to rent from John Koch, but did not. He wanted $500 deposit; she had only $150 to put down. He excused himself, went to his bathroom, walked out toward her with his pants unzipped and his erect penis and pubic hair in full view, a condom dangling unrolled from his pocket. He said they would make some adjustment on the deposit. She took the rental paperwork and left. She was embarrassed, fearful of what he would do, and she did not go back.

### 4. Rachael McCluskey

In 1999–2000 she acquiesced in his demand for sex—he said if she did not have sex with him, he would have all her things thrown out into the street. She had no place to go so had sex with him for one to one and one-half hours. He did not have her things thrown out. She did not give in to him again. She then read up on renter's rights. After that, he wanted oral sex, but she said no and that he couldn't do anything to her without serving her notice. He had her evicted. The relationships with her daughter, with her boyfriend and with men have changed as a result.

### 5. Tamechia Nedds

She was a woman with two young children and a husband who was a full-time student. She looked at a house for rent for $475 a month and loved it. She told Koch that her deadline for getting out of her present house was July 15. He said there was no problem. As she left, he asked if he could have a "taste." She took it to mean sex and said no. He delayed

the occupancy date of the rental house beyond her July 15 deadline, and asked again for a "taste." She again refused. She had lost her job because of his delaying the occupancy date. She reported Koch to Fair Housing, who asked if she would be willing to wear a tape and record a conversation with John Koch. She agreed and did tape a conversation in which he asked if she would have sex with him, and he would knock off $75 from her rent.

### 6. Felisha Scoggins

In applying for rent in 2001, she filled out the application form and asked John Koch what else he wanted. He said she could put her measurements on the application form. She did put her physical measurements on the form and wishes now she had not. He said he would work with her to take $75 off the rent monthly as long as no man was in the house and she gave sexual favors to him. She was prepared to pay full rent and refused his offer. He sat in a chair and asked if she would dance sexually for him. She declined. He asked her to sit on his lap and she did. He wanted to suck her breasts, but was refused. She decided not to rent from him because she felt unsafe. She still feels unsafe and refuses to rent without her father being present.

### 7. Deborah Sterling

She rented for about a year during 1992. At one point she owed John Koch $75 in rent. He said she could take it out in trade. He said he wanted to "see her titties." Once he sat down and said he wanted her to run her hand over his penis. She refused. He asked if she wanted to touch it. She said no. As a result, she was scared all the time, felt insecure, and didn't dare open her windows. She moved out because of fearing him.

### 8. Brenda Parker Taylor

When she went to rent a house from John Koch, she had no money and he asked her to give him oral sex. She did not respond. In awhile she did what he requested, gave him oral sex that day. She felt she had to comply, because she could not go back to the house where she had lived and did not have much family support. He made clear that she was not able to stay in the rental house if she didn't comply. She did not want to do oral sex but did not want to be put out in the streets either. The shelter was full. After that he came around every day to repair the sink and every day he asked for oral sex, saying that if he got it, she would not have to worry about the light bill and could continue to stay in the house. She never received a light bill. She did give Koch oral sex nine or ten times while she lived there, always to be able to stay. He never said anything about her being behind on her rent. When he wanted to urinate on her breasts, she refused and was ready to leave. She did move out at his request. The emotional effect has been considerable, because her husband thought she had been paying the bills and later she had to tell him the truth, whereupon he put a knife to her head and put her in a mental hospital. She did what she thought she had to do.

### 9. Anita Thomas

After she had rented from Koch, he said he would give her a refrigerator and a stove if she had "favors" (sex) with him or if she would dance nude for him. She would not. In 1998–9 he said he would have her evicted if she wouldn't have sex with him. Once he left urine in a spray bottle she used for ironing her daughter's clothes, turned her heat off in retaliation for another person's actions, locked the rental house's doors so she could not get

in, came numerous times to her house and left lingerie, jewelry, and other gifts, saying he wanted to see her in the lingerie. She reported him to the Omaha Housing Authority without avail. As a result of her eviction, she had no permanent home for three months, living "everywhere" and "anywhere."

*10. Kali Underwood*

It became clear to her that she would not be permitted to rent from John Koch unless she performed sex with him. At his insistence she showed him her breasts. He grabbed them and masturbated in front of her; he ejaculated, wiped himself off with a towel, and signed the rental papers for the house. The effect of all of this on her is that she is not a trusting person anymore.

### C. Remaining Arguments

The defendant's motion for judgment as a matter of law states,

> The Defendant also seeks [j]udgment as a matter of law on all § 3617 claims alleging illegal conduct through Defendant's discussions with Aggrieved Persons and the Department of Justice's allegation. Any conversations with Aggrieved Person[ ]s occurred after separation from housing or the individual (Lisa Carroll) never informed Defendant she had spoken with the DOJ. Those allegations are legally insufficient as a matter of law and the claims should be dismissed.

(Filing 102 at 7–8.) This argument is unclear, and I cannot identify the claims the defendant seeks to eliminate. However, at trial the defendant argued as follows:

> And also, Your Honor, which falls under the 3617, any claims that discuss or talk about Mr. Koch threatening or intimidating or interfering with the Department of Justice investigation fall woefully short, particularly with Lisa Carroll.

Her testimony was she never told Mr. Koch that she talked to anybody from the Department of Justice, and that she cried or shed a tear when he discussed things with her. So any claims that Mr. Koch had any knowledge and that somehow threatened, intimidated or interfered with aggrieved persons should be dismissed, as no reasonable juror could possibly find that is the case.

(Transcript of Proceedings, November 30, 2004.) Thus clarified, the defendant's argument appears to be that he is entitled to judgment as a matter of law with respect to the claim that he interfered with the government's investigation, especially insofar as that claim is based upon evidence that he threatened or intimidated Lisa Carroll.

The jury was not instructed specifically that Koch's interference with the government's investigation would amount to a violation of the Fair Housing Act. However, the jury was instructed that a violation may exist if the evidence shows that Koch "retaliated against any female tenant because that tenant had made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act." I find that when the evidence is considered in the light most favorable to the plaintiff, I cannot conclude that "all the evidence points one way and is susceptible of no reasonable inferences" that sustain the plaintiff's claim that Koch retaliated against Lisa Carroll. *Rockwood Bank v. Gaia*, 170 F.3d 833, 841 (8th Cir. 1999). Specifically, there was testimony that could support findings that Koch was aware of the government's investigation of his conduct; that Koch knew that Lisa Carroll was somehow involved in that investigation; that Koch had Lisa Carroll evicted after they discussed the investigation; and that Koch had not moved to evict Lisa Carroll in the past, despite her failure

to make rental payments. Therefore, I cannot conclude that the defendant is entitled to judgment as a matter of law on the plaintiff's retaliation claim as to Lisa Carroll.

Finally, the defendant also argues that there has been no evidence of "economic or special damages," such as "costs of moving, storage, etc.," and that "all claims for security deposit[s] at a subsequent residence are not proper claims." (Filing 102 at 8.) These arguments have already been resolved in the defendant's favor; claims for these damages were not submitted to the jury.

**IT IS THEREFORE ORDERED** that the defendant's motion for judgment as a matter of law, filing 102, is denied.